UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HECTOR LUIS ROSADO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:20-cv-30124-KAR |
| | ) |
| KILOLO KIJAKAZI,[1] | ) |
| Acting Commissioner of Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR
JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
COMMISSIONER'S DECISION
(Docket Nos. 17 & 20)

ROBERTSON, U.S.M.J.

I. INTRODUCTION

Hector Luis Rosado ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 *et seq.* Plaintiff applied for DIB on January 16, 2018 alleging a December 22, 2017 onset of disability due to diabetes, depression, and insomnia (Administrative Record "A.R." at 64, 156). After a hearing, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled from December 22, 2017 through June 28, 2019, the date of the decision, and denied his application for DIB (A.R. at 64-77). The Appeals

---

[1] On July 9, 2021, Kilolo Kijakazi was appointed as Acting Commissioner of the Social Security Administration by President Joseph R. Biden. Under Fed. R. Civ. P. 25(d), the acting commissioner is automatically substituted for her predecessor, Andrew M. Saul.

1

Council denied review on June 5, 2020 (A.R. at 1-6) and, thus, Plaintiff is entitled to judicial review. *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff seeks remand or reversal based on his claims that the ALJ erred by failing to: (1) find that Plaintiff's cataracts were a severe impairment at step two of the sequential evaluation process; and (2) consider the alleged opinion of a treating physician that was submitted after the hearing before the ALJ. Pending before this court are Plaintiff's motion for judgment on the pleadings (Dkt. No. 17), and the Commissioner's motion for an order affirming her decision (Dkt. No. 20). The parties have consented to this court's jurisdiction (Dkt. No. 16). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons discussed below, the court denies Plaintiff's motion and allows the Commissioner's motion.

II.   FACTUAL BACKGROUND

A.   Plaintiff's Educational Background, Work History, and Daily Living Activities

Plaintiff was 59 years old on the date of the hearing in April 2019 (A.R. at 118, 122). He earned a GED and drove a school bus from March 1998 to December 2017 when he stopped working (A.R. at 122, 164, 272). An August 20, 2018 letter from Plaintiff's PCP, Kristin O'Connor, FNP, BC, indicated that she "placed him out of work" due to his "suicidal ideation, post-traumatic stress disorder ["PTSD"] and alcohol abuse" (A.R. at 465).

In function reports dated February 5, 2018 and May 1, 2018, Plaintiff indicated that he had "no problems" with performing personal care activities, including shaving (A.R. at 298, 338). He prepared sandwiches, canned soup, and frozen meals and drove a car in February 2018 (A.R. at 299, 300, 339). Although Plaintiff reported that he wore eyeglasses and was not able to see clearly with glasses because of diabetes, he did not indicate, by checking a box on the form, that his illnesses or conditions affected his ability to see (A.R. at 302, 304, 342).

Plaintiff's friend and roommate, Raquel Perez, stated that Plaintiff needed reminders to bathe, shave, change his clothes, and take his medication (A.R. at 330, 331). Ms. Perez noted that Plaintiff went grocery shopping and paid his bills (A.R. at 332). She further stated that Plaintiff stopped working due to "stress on the school bus and with coworkers" (A.R. at 335).

B. Relevant Medical History[2]

In July 2017, Plaintiff underwent bilateral pterygium excisions that were performed by James S. Rosenthal, M.D. (A.R. at 398, 401, 436).[3] On February 2, 2018, Plaintiff complained to Molly Spatcher, OD, of the Eye & Lasik Center that his eyes were burning and red, his vision was blurry, and he experienced "a stabbing pain in both eyes" (A.R. at 436). Plaintiff's uncorrected visual acuity was 20/80 in his right eye and 20/200 in his left eye (A.R. at 437). He was diagnosed with nuclear sclerotic cataracts in both eyes (A.R. at 438). Plaintiff elected to defer surgery and to try a new eyeglass prescription instead (A.R. at 438). Dr. Spatcher noted that Plaintiff had diabetes mellitus "without evidence of retinopathy" (A.R. at 438).

When Plaintiff returned to the Eye & Lasik Center on November 26, 2018, he reported that he did not see objects clearly (A.R. at 583). Plaintiff's increased light sensitivity made it difficult to drive during the day and at night (A.R. at 583). He experienced occasional pain (A.R. at 583). He left his glasses at home that day (A.R. at 583). Plaintiff's uncorrected visual acuity was 20/60 in his right eye and 20/70 in his left eye (A.R. at 584). The examiner, John F. Warren, M.D., noted that Plaintiff's complaints were consistent with his "significant cataracts" and that

---

[2] Plaintiff only challenges the ALJ's evaluation of his vision. Therefore, only his treatment that is relevant to his cataracts is summarized here.

[3] "A pterygium is a noncancerous growth that starts in the clear, thin tissue (conjunctiva) of the eye." *Pterygium,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINEPLUS, https://medlineplus.gov/ency/article/001011.htm (last visited on Nov. 12, 2021).

3

his "ocular condition is worsening" (A.R. at 583, 585). Plaintiff elected to undergo cataract extraction and interocular lens implantation (A.R. at 585).

On February 15, 2019, Dr. Warren performed the procedure on Plaintiff's left eye (A.R. at 576). The next day, Plaintiff was "doing well" and his vision was "good" (A.R. at 570, 572). The uncorrected visual acuity in his left eye was 20/60 (A.R. at 571). During a follow-up visit on February 20, 2019, Plaintiff complained of cloudy vision and glare (A.R. at 566). His uncorrected vision was 20/70 in his right eye and 20/50 in his left eye (A.R. at 567). Upon examination, Plaintiff's left eye appeared stable, well positioned, and healing well (A.R. at 568).

Dr. Warren surgically removed the cataract in Plaintiff's right eye and implanted an interocular lens on March 1, 2019 (A.R. at 565). The next day, Plaintiff was "doing well," his vision was "a little cloudy," and the uncorrected visual acuity in his right eye was 20/50 (A.R. at 559, 560, 561). The record of Plaintiff's March 7, 2019 visit to Primary Care Associates, LLC, indicated that the cataract surgeries had "greatly improved" his vision (A.R. at 522). Three weeks later, on March 28, 2019, Plaintiff reported to Dr. Spatcher of the Eye & Lasik Center that he was still bothered by light sensitivity, but was not in pain (A.R. at 589, 591). His uncorrected visual acuity was 20/30 in his right eye and 20/60 in his left (A.R. at 590). Dr. Spatcher noted that Plaintiff's ocular condition was "stable" and that he was "doing well" (A.R. at 591). She conducted testing that ruled out "CME [cystoid macular edema] in setting of diabetes mellitus and macular drusen" (A.R. at 591).[4]

---

[4] "CME is 'a painless disorder which affects the central retina or macula. When this condition is present, multiple cyst-like (cystoid) areas of fluid appear in the macula and cause retinal swelling or edema.'" *Sanders v. Colvin*, No. 5:13-CV-790-D, 2015 WL 736088, at *3 n.2 (E.D.N.C. Feb. 20, 2015) (quoting *Cystoid Macular Edema*, UNIVERSITY OF MICHIGAN KELLOGG EYE CENTER, PATIENT CARE, http://www.kellogg.umich.edu/patientcare/conditions/cystoid.macular.edema.html (last visited 2 Feb. 2015)).

When Plaintiff returned to the Eye & Lasik Center on May 13, 2019, he complained of having difficulty driving at night due to the glare from headlights, seeing "halos" around headlights and "floaters with flashes of light," and experiencing "sharp pain" (A.R. at 594 [Exhibit 17F]).  Plaintiff's uncorrected visual acuity was 20/30 in his right eye and 20/40 in his left (A.R. at 595).  Dr. Warren diagnosed "posterior capsular opacification visually significant in both eyes," which is "a clouding of the membrane that supports the interocular lens implant" (A.R. at 596).  Dr. Warren noted that "[v]isual acuity is sufficiently reduced and glare is sufficiently symptomatic to warrant a laser procedure to open the capsular bag" (A.R. at 596).  He further noted that there was no evidence of diabetic retinopathy and, as to macular degeneration, Plaintiff's ocular condition appeared stable (A.R. at 596).  Dr. Warren indicated that both conditions were "potentially progressive" (A.R. at 596).

  C. <u>State Agency Non-Examining Consultants' Opinions</u>

On April 11, 2018, state agency non-examining consultant Marcia Lipski, M.D. reviewed Plaintiff's records, including Dr. Rosenthal's, and did not identify a vision-related medically determinable impairment (A.R. at 145, 147).  Upon reconsideration on May 14, 2018, Swaran Goswami, M.D., considered the available Eye & Lasik Center records as well as Dr. Rosenthal's records and noted that Plaintiff's corrected vision was 20/20- and 20/40+ on May [1]9, 2017 and 20/25 and 20/40 on September 12, 2017 (A.R. at 158-60, 397, 404).  Dr. Goswami opined that Plaintiff's "visual disturbances" were non-severe (A.R. at 160).

  D. <u>The ALJ Hearing</u>

    1. Plaintiff's Testimony

Plaintiff testified that he left his job as a bus driver because he was not able to see very well (A.R. at 122). He reported experiencing blurry vision and being bothered by light "a great deal" (A.R. at 123, 124). Consequently, he was not able to drive at night and drove "a little bit" during the day (A.R. at 125). He told one of his health care providers that he wanted to try to return to work, but the physician advised against it due to Plaintiff's depression and anxiety (A.R. at 132).

### 2. The Vocational Expert

The ALJ asked Vocational Expert ("VE") Larry Takki to assume a person with Plaintiff's age, education, and work experience who could perform medium work, but would be precluded from concentrated work exposure to fumes, dust, smoke, chemicals, and gasses, would be limited to simple, routine repetitive tasks which require concentration for two-hour time periods, would occasionally interact with the general public and coworkers, would be limited to work in a lower learning curve due to continuing stress . . . , and would not require English communication skills (A.R. at 139). The VE testified that an individual with these limitations could not perform Plaintiff's past work as a school bus driver, but could work as a hand packer, dining room attendant, and machine feeder (A.R. at 139-40).

As a second hypothetical, the ALJ described an individual with the same limitations as in the first hypothetical, but who lacked the ability to maintain persistence and pace and who would be off-task twenty percent of the workday (A.R. at 140). The VE opined that either one of those factors would preclude all work (A.R. at 141).

### 3. The Record

The ALJ admitted Exhibits 1A through 16F into the record, but agreed to keep the record open to include the treatment record from Plaintiff's May 2019 appointment with the Eye &

6

Lasik Center (A.R. at 121, 123, 141). Plaintiff's May 13, 2019 Eye & Lasik Center treatment record was included with the Eye & Lasik Center records that were entered as Exhibit 17F (A.R. at 594-97).

    III.    THE COMMISSIONER'S DECISION

    A.    <u>The Legal Standard for Entitlement to DIB</u>

In order to qualify for DIB, a claimant must demonstrate that he is disabled within the meaning of the Act. A claimant is disabled for purposes of DIB if he "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when he

> is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id; see also Goodermote v. Sec'y of Health*

*& Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must assess the claimant's Residual Functional Capacity ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate his or her RFC.  *See Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations.  *See Goodermote*, 690 F.2d at 7.

B.      The ALJ's Decision

The ALJ conducted the five-part analysis required by the regulations.  *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote,* 690 F.2d at 6-7.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 22, 2017 (A.R. at 66).[5]  *See* 20 C.F.R. § 404.1571 *et seq.*  At step two, the ALJ found that

---

[5] Plaintiff met the insured status requirements (A.R. at 66).

Plaintiff had the following severe impairments: diabetes mellitus type 2; asthma; PTSD; major depressive disorder, recurrent, severe without psychosis; generalized anxiety disorder; insomnia; and alcohol abuse disorder (A.R. at 66). *See* 20 C.F.R. § 404.1520(c). The ALJ concluded that Plaintiff's cataracts, status post cataract removal and intraocular lenses implant bilaterally, and essential hypertension were non-severe impairments (A.R. at 66-67). After assessing the so-called "paragraph B" criteria, (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself, the ALJ determined that Plaintiff had either mild or moderate limitations in those functional areas (A.R. at 68-69).[6] For purposes of step three, the ALJ reviewed Plaintiff's impairments and determined that his impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (A.R. at 67-68). *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether he could perform past relevant work, and, if the analysis continued to step five, to determine if he could do other work. *See* 20 C.F.R. § 404.1520(e). The ALJ found that Plaintiff had the RFC to perform medium work on the following terms:

> he cannot tolerate concentrated exposure to fumes, dust, smoke, chemicals and gasses; he is limited to simple, routine, repetitive tasks which require concentration for 2 hour time periods; he is limited to no more than occasional interaction with the public and coworkers; the work should be in the lower 1/3 of the stress continuum, defined as no independent decision making required, and no more than occasional changes in the work routine; and the work should not require English communication skills.

---

[6] The ALJ used the updated "paragraph B" criteria of the revised SSA regulations that went into effect on January 1, 2017. *See Covell v. Berryhill*, Civil Action No. 18-10184-DJC, 2019 WL 78995, at *9 (D. Mass. Jan. 2, 2019).

(A.R. at 70). At step four, the ALJ found that Plaintiff had not been able to perform his past relevant work through the date last insured (A.R. at 75). *See* 20 C.F.R. § 404.1565. However, taking into account Plaintiff's age, education, work experience, and RFC, based on the VE's testimony, the ALJ found that Plaintiff could perform the jobs of hand packer, dining room attendant, and machine feeder (A.R. at 75-76). *See* 20 C.F.R. §§ 404.1569, 404.1569(a). Consequently, the ALJ concluded that Plaintiff was not under a disability at any time from December 22, 2017, the alleged onset date, through June 28, 2019, the date of the decision (A.R. at 76-77). *See* 20 C.F.R. § 404.1520(g).

  IV. STANDARD OF REVIEW

  The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill,* 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of law *de novo*, but "the ALJ's findings shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981) (citations omitted)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51,

56 (1st Cir. 2003)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee,* 744 F. App'x at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

 V. ANALYSIS

 **A. The ALJ did not err at step two by concluding that Plaintiff's cataracts were a non-severe impairment.**

Plaintiff claims that the ALJ erred by concluding that Plaintiff's cataracts were a non-severe impairment at step two of the sequential evaluation process and by crafting an RFC that failed to reflect that severe impairment (Dkt. No. 18 at 8-13). Plaintiff's contentions lack force.

At step two of the disability evaluation process, "the claimant has the burden of proving, through objective medical evidence, that [his] impairments are severe." *Teves v. McMahon,* 472 F. Supp. 2d 82, 86 (D. Mass. 2007). "Under the Social Security regulations, an impairment or combination of impairments is considered severe if it 'significantly limit[s] [the claimant's] physical or mental ability to do basic work activities.'" *Rascoe v. Comm'r of Soc. Sec.*, 103 F. Supp. 3d 169, 182 (D. Mass. 2015) (alterations in original) (quoting *Teves*, 472 F. Supp. 2d at 86). As relevant here, the ability to see is necessary to perform basic work activities. *See* 20 C.F.R. § 404.1522(b)(2). Although "the plaintiff's burden at this stage 'is not onerous,'" *Rascoe,* 103 F. Supp. 3d at 182 (quoting *Teves*, 472 F. Supp. 2d at 87), Plaintiff failed to show that cataracts were a severe impairment.

There is support in the record for the ALJ's determination that Plaintiff's visual impairment did not "cause more than a minimum effect on his ability to engage in basic work related activities and is a nonsevere impairment" (A.R. at 67). Plaintiff underwent cataract

11

extraction and interocular lens implantation on his left eye on February 15, 2019 and on his right eye on March 2, 2019 (A.R. at 67, 565, 576).  About one week after Plaintiff's second surgery, he told his PCP that his vision had "greatly improved" (A.R. at 67, 522).  On March 28, 2019, Plaintiff's uncorrected visual acuity was 20/30 in his right eye and 20/60 in his left eye (A.R. at 67, 590).[7]  His ocular condition was "stable," he was not experiencing pain, and was "doing well" on that date (A.R. at 589, 591).  On May 13, 2019, Plaintiff complained of glare and "sharp pain" (A.R. at 594).  Dr. Warren diagnosed "posterior capsular opacification visually significant of both eyes" and determined that a corrective laser procedure was warranted (A.R. at 596).  "A mere diagnosis of a condition 'says nothing about the severity of the condition.'"  *White v. Astrue,* Civil Action No. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (quoting *Higgs v. Bown,* 880 F.2d 860, 863 (6th Cir. 1988)).  The record of the May 13, 2019 visit shows that Plaintiff's uncorrected visual acuity in his right eye remained at 20/30 but, since his March visit, the uncorrected visual acuity in his left eye had improved to from 20/60 to 20/40 (A.R. at 590, 595).  His ocular condition remained "stable" with no evidence of diabetic retinopathy (A.R. at 596).  Because the treatment records supported the ALJ's conclusion that Plaintiff's vision had significantly improved after the cataract removal surgery (A.R. at 67, 74), the ALJ did not err in finding Plaintiff's cataracts to be a non-severe impairment at step two.

---

[7] The ALJ made what appear to be typographical errors when recounting the details of the March 28, 2019 Eye & Lasik Center treatment record by stating the date as "March 29, 2018" instead of "March 28, 2019" and by stating the visual acuity in Plaintiff's left eye as "20/50" instead of "20/60" (A.R. at 67, 589-90).  Plaintiff did not mention these errors or claim that they harmed his case.  *See Grant v. Colvin*, No. CV 13-13102-DHH, 2015 WL 4945732, at *11 (D. Mass. Aug. 20, 2015) ("there is a burden on the [p]laintiff to show, if there was an error, that the [p]laintiff was harmed as a result.") (citing *Shineski v. Sanders*, 556 U.S. 396, 409 (2009)).

The step two severity requirement "is nothing more than 'a *de minimis* policy, designed to do no more than screen out groundless claims.'" *Rascoe,* 103 F. Supp. 3d at 182 (quoting *McDonald v. Sec'y of Health & Human Servs.,* 795 F.2d 1118, 1124 (1st Cir. 1986)).  The ALJ did not err by concluding that Plaintiff's cataracts were not a severe impairment at step two.  Even had he done so, "[i]t is well-settled that 'a claimant cannot demonstrate harmful error at [s]tep [t]wo unless the failure to make severity findings ends the analysis.'"  *Page v. Berryhill*, Case No. 3:17-cv-30093-KAR, 2018 WL 6834594, at *9 (D. Mass. Dec. 27, 2018) (quoting *White v. Colvin*, No. CA 14-171 S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015)).  In the instant case, the ALJ found other severe impairments at step two (A.R. at 66), and expressly stated that he considered the cumulative effect of all of Plaintiff's symptoms when crafting the RFC (A.R. at 70).  *See Robles Soto v. Saul*, Case No. 3:18-cv-30134-KAR, 2019 WL 4543219, at *16 (D. Mass. Sept. 19, 2019) (once an ALJ identifies a severe impairment, he must consider the limiting effects of all the claimant's impairments when formulating the RFC); *McDonough v. U.S. Soc. Sec. Admin., Acting Comm'r*, No. 13-CV-164-PB, 2014 WL 2815782, at *11 (D.N.H. June 23, 2014) ("An ALJ's RFC 'must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."'") (quoting *Stephenson v. Halter,* No. CIV. 00-391-M, 2001 WL 951580, at *2 (D.N.H. Aug. 20, 2001)); 20 C.F.R. § 404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."); SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996) ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'  While a 'not severe' impairment(s) standing alone

13

may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim."); *see also* 20 C.F.R. § 404.1523(c).  In addition to Plaintiff's Eye & Lasik Center treatment records, the ALJ's RFC formulation took into account Plaintiff's hearing testimony about his vision (A.R. at 70, 74).

The only evidence that Plaintiff's vision was impaired to a degree that it would affect his ability to work came from Plaintiff's hearing testimony that he left his job as a bus driver because he was not able to see well, his vision was "blurry," light bothered him "a great deal," he did not drive at night, and he drove "a little bit" during the day (A.R. at 70, 122-25).  The ALJ found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects" of his symptoms were inconsistent with the record evidence (A.R. at 72).  "Where the objective medical evidence in the record does not appear consistent with Plaintiff's claims of functional limitations, the ALJ was not required to credit [his] assertions." *DeCepeda v. Berryhill*, Case No. 17-cv-30080-KAR, 2018 WL 3748170, at *14 (D. Mass. Aug. 6, 2018).  Plaintiff's stated reason for leaving his job as a bus driver was inconsistent with his PCP's January 15, 2018 treatment note, which stated that Plaintiff did not wish to return to work because it was "a stressor," his PCP's August 20, 2018 letter, which indicated that he left work due to his "suicidal ideation, PTSD and alcohol abuse," and Ms. Perez's function report, which reported that "stress" caused Plaintiff to leave his job (A.R. at 70, 335, 409, 465).  "It is the responsibility of the ALJ, and not the court, 'to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts of evidence.'" *Arrington v. Colvin*, 216 F. Supp. 3d 217, 236 (D. Mass. 2016), *aff'd sub nom. Arrington v. Berryhill*, No. 17-1047, 2018 WL 818044 (1st Cir. Feb. 5, 2018) (quoting *Teague v. Colvin*, 151 F. Supp. 3d 223, 226 (D. Mass. 2015)).

As to Plaintiff's testimony concerning his blurred vision and light sensitivity, the hearing occurred before May 13, 2019 when Dr. Warren recognized those symptoms as indicating posterior capsular opacification related to the interocular lens implants and recommended a corrective laser procedure (A.R. at 118, 596).  Notwithstanding Plaintiff's condition, his uncorrected visual acuity was 20/30 in his right eye and 20/40 in his left (A.R. at 595).  Neither Dr. Warren nor any other medical source imposed limitations on Plaintiff's driving or other activities or identified work-related limitations caused by Plaintiff's vision (A.R. at 559-96).  *See Torres v. Sec'y of Health & Human Servs.,* 870 F.2d 742, 744 (1st Cir. 1989) ("No report contained the slightest hint of a medical opinion indicating that the claimant's impairment would preclude him from substantial gainful activity as defined in the Act."); *DeCepeda*, 2018 WL 3748170, at *14 ("There is no evidence any physician restricted Plaintiff from driving or opined on limitations resulting from vision impairments.").  The ALJ's discounting of Plaintiff's testimony was supported by substantial evidence.

Plaintiff's step two error claim fails because he has not identified any evidence to support his contention that the RFC was deficient.  "[A]n error at step two is uniformly considered harmless, and thus not to require remand, unless the plaintiff can demonstrate how the error would necessarily alter the RFC finding and change the outcome of the plaintiff's claim." *Bolduc v. Astrue*, Civil No. 09–220–B–W, 2010 WL 276280, at *4 n.3 (D. Me. Jan. 19, 2010).  *See Caterino v. Berryhill,* 366 F. Supp. 3d 187, 194 (D. Mass. 2019) ("[T]he burden is on the plaintiff to present sufficient evidence of how [his] alleged impairment limits [his] functional capacity.").  Plaintiff reiterates the contents of his treatment records, including diagnoses, to support his claim of additional functional limitations attributable to cataracts (Dkt. No. 18 at 10-12).  However, the records do not contain objective medical evidence or opinions that identify

cataract-related functional limitations on Plaintiff's ability to perform basic work activities. *See DeCepeda,* 2018 WL 3748170, at *14 ("The record is bereft of objective medical evidence substantiating functional limitations attributable to cataracts or any other vision impairment."); *Allen v. Berryhill*, CIVIL ACTION NO. 16-40058-TSH, 2017 WL 4390263, at *3 (D. Mass. Sept. 29, 2017) ("In her argument, Plaintiff gives a full summary review of her medical records, but fails to specify the limitations she claims that her impairments require. The court is not inclined to do so for her."). The treatment providers' diagnoses are insufficient to meet Plaintiff's burden. *See Mercado-Acosta v. Comm'r of Soc. Sec.,* Civ. No.: 19-2018 (SCC), 2021 WL 4352792, at *4 (D.P.R. Sept. 24, 2021) (a diagnosis, without more, does not establish functional limitations); *Martin v. Colvin*, CIVIL ACTION NO. 4:15-40128-TSH, 2016 WL 5376316, at *11 (D. Mass. Aug. 3, 2016) ("'a diagnosis . . . standing alone, does not establish the severity of the disease nor the limitations that result for a particular individual.'") (alteration in original) (quoting *Dowell v. Colvin*, No. 2:13–cv–246–JDL, 2014 WL 3784237, at *3 (D. Me. July 31, 2014)). Without showing that a functional limitation attributable to cataracts was omitted from the RFC, Plaintiff has not established harm from the absence of a severe impairment finding at step two. *See Joshua S. v. Kijakazi,* No. 1:20-CV-00427-JDL, 2021 WL 5036015, at *4 (D. Me. Oct. 27, 2021) ("Plaintiff has not established that a severe impairment finding would result in any additional limitations on his work capacity."); *Keith S. v. Berryhill,* C.A. No. 17-00503-JJM, 2018 WL 6599876, at *8 (D.R.I. Dec. 17, 2018) (the ALJ was not required to include functional limitations in the RFC that were without support in the record evidence.). The ALJ's decision is affirmed.

In sum, the ALJ adequately considered the evidence related to Plaintiff's cataracts and determined that they were non-severe at step two. Even if the ALJ erred at step 2, which he did

not, Plaintiff's failure to show that his cataracts caused functional limitations that should have been reflected in the RFC made any such error harmless.

> **B.     Dr. Warren's May 13, 2019 treatment record in Exhibit 17F does not contain a "medical opinion" as defined by the regulations.**

Plaintiff makes two related claims concerning Exhibit 17F, which contains the March 28, 2019 and May 13, 2019 Eye & Laser Center records (A.R. at 589-97). First, Plaintiff asserts that although the ALJ indicated that he would keep the record open after the hearing for submission of the records, he did not consider all of them (Dkt. No. 18 at 16-17). Second, Plaintiff contends that the ALJ failed to properly consider Dr. Warren's May 13, 2019 "opinion" (Dkt. No. 18 at 16-17). Neither of Plaintiff's arguments is persuasive.

The ALJ admitted Exhibits 1A through 16F into the record at the April 16, 2019 evidentiary hearing, but agreed to keep the record open to include the treatment record from Plaintiff's upcoming appointment with the Eye & Lasik Center (A.R. at 121, 123, 141). There is no dispute that Exhibit 17F was submitted to the Commissioner on May 23, 2019 (Dkt. No. 18 at 15; Dkt. No. 21 at 11).[8] Exhibit 17F contains the Eye & Lasik Center records from Plaintiff's visits on March 28, 2019 and May 13, 2019 (A.R. at 588-97). The ALJ referred to Exhibit 17F in his decision (A.R. at 66, 67, 74). Although the ALJ not explicitly refer to the May 13, 2019, record, he was not required to do so. "While 'an ALJ's written decision need not directly address every piece of evidence in the administrative record if it is cumulative of evidence already discussed by the ALJ or fails to support the claimant's position[,] . . . an ALJ may not simply

---

[8] In support of his claim, Plaintiff points to the ALJ's alleged error in what appears to be a boilerplate statement in his decision: "[t]he claimant submitted or informed the [ALJ] about all written evidence at least five business days before the date of the claimant's scheduled hearing" (A.R. at 64; Dkt. No. 18 at 13). That statement is inconsistent with Plaintiff's representation that Exhibit 17F was submitted on May 23, 2019. Plaintiff fails to show that he was harmed by the misstatement. *See Grant*, 2015 WL 4945732, at *11.

17

ignore relevant evidence, especially when that evidence supports a claimant's cause.'" *Leggett v. Berryhill*, CIVIL ACTION NO. 16-11027-JGD, 2018 WL 700786, at *6 (D. Mass. Feb. 2, 2018) (alterations in original) (quoting *Dube v. Astrue*, 781 F. Supp. 2d 27, 35 (D.N.H. 2011) (internal quotation and citation omitted)).  The May 13, 2019 record, which indicated that Plaintiff's uncorrected visual acuity was 20/30 and 20/40 in his right and left eyes, respectively, and that his ocular condition appeared "stable," was consistent with the ALJ's determination that Plaintiff's vision improved "greatly" after cataract surgery.  The record did not support Plaintiff's claim of disability (A.R. at 66, 67, 595, 596).

Plaintiff's second contention concerns the ALJ's alleged failure to comply with 20 C.F.R. § 404.1520c when discussing what Plaintiff characterizes as Dr. Warren's May 13, 2019 "medical opinion."  For claims filed on or after March 27, 2017, such as Plaintiff's, a "medical opinion" is defined as "a statement from a medical source about what [an individual] can still do despite [his or her] impairment(s) and whether [the individual] has one or more impairment-related limitations or restrictions in [one or more specified] abilities," including the ability to see. 20 C.F.R. § 404.1513(a)(2)(iii).

Plaintiff contends that the following statements in the May 13, 2019 treatment record constitute Dr. Warren's opinions:

- Plaintiff's subjective complaints about having difficulty driving at night and having "sharp pain" (Dkt. No. 18 at 16; A.R. at 594).
- Dr. Warren's diagnosis of "posterior capsular opacification visually significant in both eyes" and the observation that "[v]isual acuity is sufficiently reduced and glare is sufficiently symptomatic to warrant a laser procedure to open the capsular bag" (Dkt. No. 18 at 16; A.R. at 596).
- When describing the diagnosis of posterior capsular opacification and the recommended treatment, Dr. Warren commented that "the patient's ocular condition is worsening" (Dkt. No. 18 at 16; A.R. at 596).
- Dr. Warren's diagnosis of macular drusen and statement that "[t]hese accumulations of degenerative material beneath the retina are indicative of overlying retinal dysfunction and are a hallmark of macular degeneration.  No

> treatment is available at this time. . . . [Plaintiff's] ocular condition appears stable but is potentially progressive" (Dkt. No. 18 at 16; A.R. at 596).

Because Dr. Warren did not identify what Plaintiff could or could not do as a result of his vision impairments or what specific limitations or restrictions his impairments imposed on his ability to work, none of these statements is being a "medical opinion," as defined by § 404.1513(a)(2), which the ALJ was required to discuss. *See Karen S. v. Saul*, No. 2:19-cv-00522-JHR, 2020 WL 6047693, at *4 (D. Me. Oct. 12, 2020). Plaintiff presents no basis to reverse the ALJ's decision.

VI. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 17) is DENIED. Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. No. 20) is ALLOWED. The Clerk's Office is directed to close the case on this court's docket.

It is so ordered.

Date: November 29, 2021                    /s/ Katherine A. Robertson
                                           KATHERINE A. ROBERTSON
                                           U.S. MAGISTRATE JUDGE